UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Shaneika Bolt,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Planned Parenthood of Central and Western New York;<br><br>Sara White-Smith; and<br><br>Bivona Child Advocacy Center,<br><br>　　　　　Defendants. | Civil Action No. 24-6061<br><br>Complaint and Jury Demand<br><br>Date Received 01/30/2024 |

## **PARTIES**

1. Shaneika Bolt ("Plaintiff Bolt") joined Planned Parenthood in 2020, bringing with her a background as a case worker for Monroe County, where she tirelessly worked to meet the needs of children navigating difficult situations. With her prior experience and a degree from the University of Dayton, she established a solid foundation to thrive at Planned Parenthood of Central and Western New York ("Planned Parenthood").

2. Planned Parenthood is a prominent nonprofit organization offering essential reproductive health services and education worldwide. Their comprehensive services include reproductive health, family planning, sexual health education, safe and legal abortion services, and LGBTQ+ inclusive care.

3. Bivona Child Advocacy Center ("Bivona") supports and advocates for children who have experienced abuse or neglect. They offer crucial services such as forensic interviews,

medical evaluations, mental health support, advocacy, and community education to ensure the safety and wellbeing of these vulnerable children.

4. Sara White-Smith is a former employee of Defendant Bivona who had supervisory authority over Plaintiff Bolt.

## JURISDICTION AND VENUE

5. This Court's jurisdiction is invoked pursuant to 28 USC §1331. This Court's pendant jurisdiction is also invoked.

6. Venue is proper in the United States District Court for the Western District of New York under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732 because Defendants are headquartered and transact business in the Western District of New York.

## OPENING STATEMENT

7. As a Planned Parenthood employee Plaintiff Bolt worked directly with and for employees of Defendant Bivona including the Multi-Disciplinary Coordinator of Bivona, Sara White-Smith.  White-Smith engaged in illegal, harassing behavior towards Plaintiff Bolt that included physical intimidation, crude jokes, and nonconsensual sexual contact. Plaintiff Bolt reported White-Smith's conduct to their employers but to no avail.  Despite these alarming actions, Bivona and Planned Parenthood took limited action in response to the harassment. Instead, they took the position that Plaintiff Bolt was required to work with all staff.  When Plaintiff Bolt objected, Defendants punished Plaintiff Bolt by (a) counseling her on her deficiencies as an employee, and then (b) isolating her for her "protection" from her assailant instead of isolating (or terminating) White-Smith.

8. Plaintiff Bolt was unable to continue working in the hostile environment created by White-Smith and fostered by Defendants. She was forced to take a leave of absence to treat her extreme emotional distress.

9. Still, Planned Parenthood and Bivona failed to appropriately address the situation, ultimately resulting in her constructive termination, and profoundly and detrimentally impacting Plaintiff Bolt's professional career and emotional wellbeing.

## FACTUAL ALLEGATIONS

10. Plaintiff Bolt commenced her employment with Planned Parenthood on June 8, 2020, assuming the role of a Family Advocate. In this capacity, her responsibilities primarily involved guiding children and their families through the court process in cases of sexual or physical abuse, as well as other forms of trauma.

11. With her respect for Planned Parenthood as a renowned national organization and her prior experience as a dedicated child advocate, Plaintiff Bolt was genuinely grateful for the opportunity to contribute to their mission. She eagerly anticipated the meaningful work ahead and the chance to make a positive impact in the lives of those she served.

12. Plaintiff Bolt collaborated closely with two senior child advocates, Maggie Huntoon from Planned Parenthood and Katelyn Popp from Bivona.

13. Plaintiff Bolt's office was located at Bivona's Rochester location, which shared office space with Planned Parenthood. The employees of both organizations worked closely together, engaging in daily communication and collaboration. There was virtually no distinction between the employees, except for the source of their respective paychecks.

14. Accordingly, White-Smith (an employee of Bivona) took on the role of mentoring Plaintiff Bolt, sharing her experience as a former child advocate of over twenty years. Early in

2020, Plaintiff Bolt had the opportunity to shadow White-Smith on multiple cases, observing and learning from her guidance. They also traveled together to the city court, commuting side by side in White-Smith's car.

15. As their working relationship continued, however, Plaintiff Bolt began to notice that White-Smith was developing a peculiar interest in her. This was evident as White-Smith often complimented Plaintiff Bolt's physical appearance and style.

16. White Smith also appeared to fixate on Plaintiff Bolt's approval, copying her appearance and changing her office to reflect Plaintiff Bolt's likes and dislikes.

17. There were also instances where Plaintiff Bolt discovered White-Smith standing in Plaintiff Bolt's officer staring out of the window.

18. Plaintiff Bolt became increasingly unsettled by White Smith's actions.

19. Plaintiff Bolt nevertheless understood from her employer that she must continue working with White-Smith if she wanted her career to progress.

20. In September 2021, Plaintiff Bolt achieved notable success in her position, leading to her promotion as the Lead Child Advocate.

21. Around the same time, Natalie Ramirez, a colleague of Plaintiff Bolt, transitioned from Planned Parenthood to join Bivona as a family advocate. Despite the change, they continued to collaborate and work together in their new roles.

22. In March 2022, Plaintiff Bolt was walking to Katelyn Popp's office when she unexpectedly encountered White-Smith in the company of two colleagues: Natalie Ramirez and Stacey Hermanson (also an employee of Bivona) who were sitting in White-Smith's office chatting.

23. To Plaintiff Bolt's distress and humiliation, White-Smith shouted at her, "Shaneika, give me some titties," prompting laughter from Ramirez and Popp, who Plaintiff Bolt heard laughing from her office beside White-Smith's office.

24. This behavior caught Plaintiff Bolt off guard. Feeling shocked, she quietly entered Popp's office and sat down. White-Smith continued to persist, asking, "Shaneika? Shaneika? Did you hear me?" and Popp continued to laugh.

25. Observing Plaintiff Bolt's discomfort and lack of amusement at the comments, Popp quickly ceased laughing. Following an awkward silence, Popp redirected the conversation towards Plaintiff Bolt's work, engaging in a discussion of their respective roles and responsibilities.

26. On May 3, 2022, Plaintiff Bolt made a formal complaint regarding the incident to Michelle Camaratta and Mary-Jo Marino, both senior leaders at Planned Parenthood.

27. Additionally, she reported the incident to the Director of Human Resources at Planned Parenthood, Amy Purcio, who assured her that an investigation would take place.

28. However, no updates regarding the investigation were provided to Plaintiff Bolt and no one interviewed Plaintiff Bolt about the incident.

29. A few days after submitting the report, Plaintiff Bolt learned that the incident was treated as office horseplay and not as a sexually hostile comment from a superior. White-Smith approached Plaintiff Bolt in her office and explained that Deb Rosen, who served as the CEO and Director of Bivona at that time, instructed White-Smith to apologize for her actions, and acknowledged that she had said something that was "perceived as disrespectful."

30. Plaintiff Bolt confirmed that the comments by White-Smith were indeed disrespectful and strange.

31. White-Smith responded only with a semi-apology, stating, "I am sorry if you were offended."

32. At that point, White-Smith appeared visibly uncomfortable and promptly left the room, displaying signs of anger and frustration.

33. Deeply disturbed by the unsettling interaction with White-Smith, someone whom Plaintiff Bolt had previously considered a mentor, she found it difficult to sleep that night. Plaintiff Bolt was afraid of White-Smith's anger and afraid for her career.

34. Overwhelmed by the situation, Plaintiff Bolt called Mary-Jo Marino, the head of the Restore Sexual Assault Program at Planned Parenthood, the next day and asked to withdraw her complaint against White Smith.

35. In response, Marino reassured Plaintiff Bolt, advising her not to worry about the matter.

36. In April 2022, Plaintiff Bolt contracted COVID-19 and took a leave of absence to recover.

37. Upon returning to work, she encountered another distressing incident involving White Smith.

38. Following a morning meeting, White-Smith began to stare at Plaintiff Bolt, creating an intimidating atmosphere. Uneasy, Plaintiff Bolt quietly left the meeting and made her way to her office. However, White-Smith followed her and positioned herself menacingly in the doorway of Plaintiff Bolt's office.

39. White-Smith proceeded to inspect various items on the walls and shelves. At one point, she singled out a pair of slippers, expressing her intention to acquire them. Plaintiff Bolt's uneasiness grew.

40. Then, on June 22, 2022, White-Smith sexually assaulted Plaintiff Bolt at a work event. It occurred at Frontier Field during a team-building event for Planned Parenthood and Bivona. Plaintiff Bolt was in Planned Parenthood's Suite, which was dimly lit and cramped, leaving Plaintiff Bolt with minimal room to maneuver.

41. To her utter shock, White-Smith, positioned herself behind Plaintiff Bolt and placed a hand on Plaintiff Bolt's right buttock. This was not a fleeting touch but rather a continuous presence, as White-Smith kept her hand fixed on Plaintiff Bolt's buttock while conversing with other Planned Parenthood employees.

42. Plaintiff Bolt was trapped by the layout of the space and was stunned that the assault was occurring in front of her colleagues. The act was unwelcome, invasive, and deeply troubling. It was not until a break in the performance that Plaintiff Bolt finally had an opportunity to leave the suite.

43. These distressing events prompted Plaintiff Bolt to immediately reach out to her friends and family, sharing the traumatic experience.

44. Plaintiff Bolt repeatedly requested the relocation of White-Smith's office or other appropriate measures to protect her from White Smith.

45. Those in authority denied her requests and ignored her pleas for help.

46. Shockingly, they disregarded her valid complaints, and instead counseled Plaintiff Bolt on her work performance each time she attempted to make a complaint.

47. To compound her distress, Plaintiff Bolt observed a noticeable change in her colleagues' behavior. They began actively avoiding her and subjected her to ridicule and mockery. Cliques formed within the building, uniting in support of White-Smith and exacerbating Plaintiff Bolt's distress.

48. Consequently, Plaintiff Bolt found herself in a state of profound isolation, left with no other choice but to be stationed alone in the East Main Street offices of Planned Parenthood, even though she would still be required to travel to Bivona's offices (and to White-Smith's presence) for meetings.

49. These actions implied that she, the victim of harassment, was somehow to blame for the distressing situation she had endured. Eventually, these incidents led to Plaintiff Bolt taking a medical leave September 1, 2022 to address stress and anxiety as a result of White-Amith's conduct and her employers' utter failure to respond appropriately.

50. Despite Plaintiff Bolt's persistent efforts to achieve an amicable resolution and part ways with Planned Parenthood on mutually agreeable terms, the organization unilaterally terminated their relationship in 2023. This abrupt decision left Plaintiff Bolt without viable work options, without health insurance, and further added to the challenges she faced in the aftermath of her ordeal.

51. Upon information and belief, White-Smith's employment was eventually terminated. However, White-Smith continues to attend Bivona events, publicly and openly, causing Plaintiff additional distress each time she sees White-Smith welcomed to events by an organization that allowed White-Smith to harass and assault Plaintiff Bolt and refused to take corrective action.

52. On or about August 9, 2022, Plaintiff Bolt brought a complaint with the New York State Division of Human Rights against Defendants Bivona and White Smith charging them with unlawful discriminatory practices relating to employment, which was assigned Case No. 10219032.

53. After investigation, the Division determined that it had jurisdiction over the complaint and that probable cause existed to believe that Defendants had engaged in unlawful discriminatory practices.

54. On or about September 7, 2023, the Division dismissed Plaintiff's Complaint for administrative convenience to allow Plaintiff Bolt to pursue her claim in Federal Court.

55. On or about November 1, 2023, the U.S. Equal Employment Opportunity Commission provided Plaintiff Bolt with a Right to Sue letter for Charge No. 16G-2022-03655.

## AS AND FOR A FIRST CAUSE OF ACTION
### (GENDER DISCRIMINATION – TITLE VII)

56. By the aforedescribed actions, Defendants have subjected Plaintiff to adverse employment action, including a hostile work environment, because of her gender in violation of Title VII.

## AS AND FOR A SECOND CAUSE OF ACTION
### (GENDER DISCRIMINATION – NYSHRL)

57. By the aforedescribed actions, Defendants subjected Plaintiff to adverse employment actions, including a hostile work environment, because of her gender, in violation of the N.Y. State Human Rights Law.

## AS AND FOR A THIRD CAUSE OF ACTION
### (RETALIATION – TITLE VII)

58. By the aforedescribed actions, Defendants subjected Plaintiff to adverse employment actions, including termination, because she complained about gender discrimination to her employers.

## AS AND FOR AN FOURTH CAUSE OF ACTION
### (RETALIATION – NYSHRL)

59. By the aforedescribed actions, Defendants subjected Plaintiff to adverse employment actions, including termination, because she complained about gender discrimination.

## DAMAGES

60. Plaintiff is entitled to compensatory damages for lost pay and other benefits in an amount to be determined at trial.

61. Plaintiff has suffered emotional distress to her injury in a sum of greater than $1,000,000.

62. Defendants' actions described above were willful violations of Plaintiff's rights, entitling Plaintiff to an award of punitive damages in the sum of $2 million.

## JURY DEMAND

63. Plaintiff demands a jury trial.

**PRAYER FOR RELIEF**

64. Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, awarding:

    a.    Compensatory Damages for lost pay and other benefits;

    b.    Damages for emotional distress;

    c.    $2 million in punitive damages;

    d.    Attorneys' fees and costs; and

    e.    Such other and further relief as is just and proper.

Dated: January 30, 2024

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS

By: /s/ *Nathan D. McMurray*
        Nathan D. McMurray
225 Broadway, Ste. 1902
New York, New York 10007
Phone: (716) 517-5506
nmcmurray@advocatesny.com